## Speer *v.* The Western and Southern Life Insurance Company, Appellant.
## Speer *v.* Prudential Insurance Co. of America, Appellant.

Argued April 26, 1945. Before BALDRIGE, P. J., RHODES, HIRT, RENO, ROSS and ARNOLD, JJ. (DITHRICH, J., absent).

*D. C. Jennings,* for Western & Southern Life Insurance Co., appellant.

*John L. Miller, John H. Scott* and *Duff, Scott & Smith,* for Prudential Insurance Co., appellant.

*Wm. F. Beatty,* for appellee.

OPINION BY ARNOLD, J., July 19, 1945:

These two cases were tried together in the court below and will be disposed of in one opinion.

The Western and Southern Life Insurance Company and the Prudential Life Insurance Company each issued what is called a double indemnity (in case of accidental death) insurance policy on the life of John H. Speer. Each policy named as beneficiary Esther F. Speer, the mother of the insured. The insured died and the respec-

tive insurance companies paid the straight life insurance loss, but refused to pay the accidental death benefit. The beneficiary brought separate suits against each insurance company.

The amount sued for was in the event "that the insured . . . has sustained . . . bodily injuries solely through external, violent and accidental means resulting directly and independently of all other causes in the death of the insured, the company will pay . . . an accidental death benefit equal to the face amount of the insurance . . ." and "No accidental death benefit will be paid if the death of the insured . . . is caused or contributed to, directly or indirectly, or wholly or partially, by disease or by bodily or mental infirmity."

It is an admitted fact that insured fell upon a concrete floor, fracturing his skull causing brain hemorrhages resulting in death, and that the death resulted wholly from the fractured skull. The question is what was the cause of the fall, the insurance company alleging that there was not sufficient evidence to find, as the jury did, that it was an accidental fall (as defined by the policy) rather than a fall caused by fainting or dizziness.

The testimony showed the insured was working at his job with a packing company in the City of Pittsburgh. As the foreman would call out the items of a meat order a man would take the items from the refrigerators and place them on a weighing scale. After they were weighed, they were taken to a table. It then became the duty of Speer (a packer) along with other packers to take the items from the table and place them in meat trays. In taking the meat from the table to the tray Speer would walk from three to five feet, and the first tray to be filled was placed on the floor and after receiving its items the next items were put in a tray placed upon it; and so on until a tier of four or five trays. The filled trays weighed from five to sixty pounds. In carrying the meat from the table to the trays Speer would go around a corner of the table.

At about 4:00 A.M. on July 31, 1942, Speer was performing this work, having gone to work at 8:00 P.M. the day before. A fellow employe, Taylor, passed Speer, whose arms were filled with meat, and tapped him on the shoulder and asked some casual question or questions, such as "How are you doing?" Speer replied, "All right", and Taylor walked on. When he was two or three feet beyond Speer, and with his back toward him, he heard a heavy bump of something hitting the floor, turned around and saw Speer unconscious upon the floor. He loosened Speer's clothing and said, "Let's go out side and get a little bit of air," Speer replied, "Oh, I feel all right". Speer was unconscious when he came to him, but became conscious within a very few minutes (enough time to rub his hands and bring him around). Speer was lying on his back. Another employe, Schmitt, who did not see the fall heard the "thud" and ran to where Speer was. He then went out to get a truck, being gone two or three minutes at the most, and when he returned Speer had revived. Schmitt asked him "How are you doing, John?" and Speer replied, "I have got an awful headache. My head hurts back in here." (Indicating a spot on the back of the head below the crown and to the left side in the vicinity of the fracture.)

The floor of the establishment was of solid concrete. There were four coolers or refrigerators in the same room, the doors of which were being opened and closed by employes getting items therefrom. Most of the time the doors were open, and in the summer this created a lot of vapor, keeping the place damp. As a rule during the hot months the floor was greasy and slippery. The insured was forty-eight years of age. He was in good spirits that night as he generally was. Schmitt had worked with Speer for a year and knew of no other accidents suffered by Speer.

The autopsy report showed death resulting from an intra-cranial hemorrhage caused by a fracture near the base of the skull on the left-hand side. Speer died an hour and ten minutes after the fall.

The defendants called Dr. Kurtz who attended Speer on December 27, 1940, with reference to his having been hit on the head with a piece of pipe on November 27, 1937 (more than five years before the instant accident). He complained to the doctor of "fear of height, light headed when in the air for a short distance," and "that he had gait difficulty." "It was very difficult (for him) to walk on uneven ground . . . (and) difficult to feel his way in the dark." He said he "swerved both ways but his left foot [was] harder to keep in line." The doctor testified he was easily excited, and walked with his feet further apart than normal, somewhat unsteady, and was unable to walk on a straight line except for a short distance and would nearly fall when he turned quickly. He had a stiff left ankle. While defendant's physician did not state that Speer suffered from dizziness he was asked the question whether Speer's "difficulty in gait and *some dizziness,* fearing height and so on and a tendency to lose his balance if he turned suddenly were the normal result of a former fractured skull." The doctor replied, "Yes". Dr. Kurtz also testified that dizziness and loss of balance frequently occurs from a skull fracture such as Speer suffered in 1938, and the symptoms in Speer were likely to go on for a long period of time in a stabilized condition. In rebuttal, the sister of the insured testified that after the 1937 accident she had lived in the same house with the insured, that she never noticed any dizziness and thought she would have if it had been present. According to her, Speer's only complaint was when "she wanted him up high."

That is the substance of the testimony in this case. The first question arising is whether the fractured skull of Speer was sustained "solely through external, violent and accidental means resulting directly and independently of all other causes in the death of the insured." This clause in the policy makes the insurer liable only if the bodily injuries were sustained through external means, violent means and accidental means; and by these

three "means" the bodily injuries directly and independently of all other causes must result in the death of the insured. Was there sufficient evidence to go to the jury on this question? Beyond question the burden is on the plaintiff to show this, but it may be shown by circumstantial evidence from which the jury may infer legitimately that the insured's death resulted from an accidental means: *Watkins v. Prudential Insurance Co.*, 315 Pa. 497, 512, 173 A. 644; *Pomorskie v. Prudential Insurance Co.*, 318 Pa. 185, 177 A. 783. In the latter case the insured was last seen alive about 6:00 P.M. on a January evening when he was working with his brother on a garage near his cabin. The brother left and the insured was not seen until the next morning when his body was found lying on a rough logging road not far from the cabin. It was fully dressed and lying on the left side. There was a bruised mark the size of a quarter on the left temple and a spot of blood about two inches in diameter. The ground was covered with sleet and snow. The left side of the body was wet from head to knees. An autopsy was performed three months later, disclosing an old injury to the left knee. The medical testimony was that death was caused by head injury and exposure. There were no eye witnesses. The Supreme Court held "Plainly, this testimony was sufficient to permit a reasonable inference of death 'effected solely through external, violent and accidental means.' The jury might well have inferred from the position of and marks on the insured's body, the surrounding circumstances, and the fact that he was apparently lame, that he fell by accident, because of some obstruction or slippery condition on the ground, and that in so doing he suffered a blow to his head which caused concussion of the brain and eventually lead to his death. There was testimony that he might have had concussion even though no evidence of concussion was found in the brain tissues. The evidence may be sufficient to sustain a finding that death occurred through external, violent and accidental means although there are no eye-witnesses (*McCullough v.*

*Railway Mail Assn.*, 225 Pa. 118, 73 A. 1007), or although it does not 'establish a specific one of a number of accidental causes', if it does in fact fairly exclude design or disease: *Taylor v. General Accident Assurance Corp.*, 208 Pa. 439, 57 A. 830."

In the *Taylor* case, supra, the assured was mounting four sandstone steps with a rubber mat on the top one at the entrance of his office. He reached the top step and was seen to fall. He was found lying at the bottom of the steps severely injured, but not unconscious. He said he did not know what caused him to fall. He died four days later from hemorrhages in the stomach. The Supreme Court stated at page 440: "It must be observed, at the outset, that there is no evidence to show just how the fall occurred—whether by tripping, by slipping, by a misstep or sudden turn causing decedent to lose his balance, or by any other specific kind of accident . . . (page 442). His position at the bottom of the steps was not that of one suddenly stricken down by disease or helplessly collapsing. His consciousness had not left him, nor his will power; for he was able to walk to his house. . . . The hemorrhages came later and were the result of the fall. It may be that all this does not absolutely exclude the possibility of a seizure of some kind as the cause of the fall; but it certainly goes to the extent of reasonably excluding both design and disease as an explanation of the fall . . . by making it vastly more probable that the cause of it was one of those innumerable accidents which, common experience teaches, may intervene with disastrous effect between the raising of a foot and the putting down of it . . . [So] long as the evidence fairly points to one or more of these things as a probable cause of the fall, rather than to an internal disorder—so long as, to quote *Merritt v. Preferred Masonic Mutl. Acct. Assn.* (Mich.), 57 N. W. 169 . . . there is 'some evidence tending to show that death resulted from an accident rather than design or natural causes,' a prima facie case is made out, and the requirement of affirmative proof of an accident is satisfied.

Nor is the inference of an accident, supported as it here is, obnoxious to the criticism that it is an inference based upon a mere presumption."

In *Curran v. The National Life Insurance Company,* 251 Pa. 420, 429, 96 A. 1041, it was said, "The question is not whether the circumstances exclude every other hypothesis, but whether they fairly support the theory advanced by the plaintiff and exclude by their preponderating weight the theory advanced by defendant. To hold as a matter of law that plaintiff failed to prove sufficient facts to take the case to the jury, would prevent recovery in most cases . . . because of the difficulty of proving the origin of the fire, thus imposing on the policyholder a burden not contemplated by the contract." See also *Stewart v. Prudential Insurance Company,* 92 Pa. Superior Ct. 256.

The question for the jury on this branch of the case was whether the fall was caused by some accident such as stumbling or slipping, or caused by dizziness or faintness.[1]

There was no evidence on the part of either the plaintiff or the defendant that the insured suffered from any dizziness or faintness *at or about the time of the accident* or indeed within two years thereof. The *opinion* of the defendant's expert was that the symptoms which Speer had in 1940 were stabilized and would continue. This was an expert opinion and the jury need consider it but were not bound to adopt it: *Shaughnessy v. Director Gen. of Railroads,* 274 Pa. 413, 118 A. 390; *Nanty-Glo Borough v. American Surety Co.,* 309 Pa. 236, 163 A. 523; *Mocan v. Nejak,* 126 Pa. Superior Ct. 149, 190 A. 208; *MacDonald v. Pa. R. R. Co.,* 348 Pa. 558, 561, 36 A. 2d 492. The theory of the defendant seems to be that there was an absence of testimony to show what caused

---

[1] This question is stated with reference to the theory upon which this case was tried. This Court is not to be understood as holding that where because of heat or exhaustion, an insured becomes dizzy or faint causing him to fall, that there could be no recovery for death or disability. That question is not here passed upon.

the fall. As stated in *Taylor v. General Accident Assurance Corp.*, supra, and followed in *Pomorskie v. Prudential Insurance Company*, supra, it is not incumbent upon the plaintiff to show the exact cause of the fall. Actually the position of the insurance company is that it is equally plausible that the insured fell because of dizziness or a faint as it is that he fell as a result of slipping or stumbling. The following facts may be pointed out as showing that the accident was the more probable cause of the fall, rather than any fainting or dizziness. The insured was forty-eight years of age, weighed 170 pounds, was in good health and good spirits. He was standing upright with his arms full of meat and talked to a fellow employe within a few seconds of his fall. The fellow employe who saw him within two or three seconds of the fall did not observe anything wrong or abnormal about the insured. There is no evidence that he ever had fallen or that he ever had fainted, nor any evidence, expert or otherwise, that he would, after 1940, be subject to a fainting spell. There was no evidence of any dizziness either as of the time of the accident or within a year prior thereto, except the expert testimony of the defendant hereinbefore pointed out. The accident was in the summer time when vapor from the refrigerators made the floor damp, and it was usually slippery or greasy during the hot months. The deceased fell backwards and did not collapse or slump forward or drop to his knees, and the fall backwards was with such severity as to fracture the skull and set up immediate hemorrhages and cause death within a little more than an hour. This testimony was sufficient to go to the jury. Were it otherwise it would require the proof *to exclude* fainting or dizziness as the antecedent cause of any fall and proof of the precise means by which the fall was brought about, and where there are no eye witnesses such would be impossible, unless it were done exactly as was done here, i. e., "by evidence of circumstances which viewed as a whole reasonably exclude, by their preponderating probative weight, any other explanation

found in the evidence." Here, the circumstances and proof fairly exclude the alleged, and really hypothetical, cause of the fall being dizziness or faintness. While the deceased was rendered unconscious by the fall he regained consciousness within a few seconds and complained only of a violent pain in the head and mentioned nothing of any dizziness, faintness or sickness.

The second point raised by the insurance company is that under the clause reading: "No accidental death benefit will be paid if *the death* of the insured . . . is caused or contributed to, directly or indirectly, or wholly or partly, by disease or by bodily or mental infirmity." It is argued that plaintiff must exclude the possibility of the 1938 fracture contributing to the accident. But this clause relates to the *death* (or the disability) and not to the accident or bodily injury, and it is the first clause (discussed herein) which relates to the causation of the bodily injuries, i. e., *the accident.* Thus if the insured sustains bodily injuries within the requirements of the first clause, he still may be excluded from recovery if said bodily injuries aggravated a preëxisting illness or infirmity which thus contributed to the *death* or *disability.*[2] One of the common examples of this is where a man suffering from diabetes melletus meets with an accident (satisfying the first clause) but because of the preëxisting disease a diabetic gangrene sets in causing death; he then fails to recover under the second clause. Cf. *Roeper v. Monarch L. Ins. Co.,* 138 Pa. Superior Ct. 283, 11 A. 2d 184. Or where, as in *Lucas v. Metropolitan Life Insurance Co.,* 339 Pa. 277, 14 A. 2d 85, an injury was suffered which satisfied the first clause, but the plaintiff had suffered a previous fracture of both legs with permanent shortening of one and a tilting pelvis, and a disability (the insured lived) which may have

---

[2] The preexisting disease or infirmity probably must be of a serious nature and not trivial, and likewise must not consist of a mere lack of physical perfection or weakness because of advanced years. See Annotation 131 A.L.R. 240, et seq.

been caused by the prior accident. In such a situation it is incumbent upon the plaintiff to show that the pre-existing infirmity was not a contributing factor to the *disability* (or death) and the plaintiff must produce further evidence to exclude that possibility. In the *Lucas* case the disability for which payment was sought was partly due to arthritis which in turn could well have been due to the prior injury, fractures and bone deformity. Since it is an admitted fact in the instant case that the insured's *death* was due *solely* and immediately to the fracture of the skull, *death* could not have been due, even partially, to a preëxisting disease or infirmity.

The only assignment of error is the refusal of the court to enter judgment n. o. v. for the insurance company.

In Esther F. Speer v. The Western and Southern Life Insurance Company, No. 172 April Term, 1945, the assignment of error is overruled and the judgment affirmed.

In Esther F. Speer v. Prudential Insurance Company of America, No. 176 April Term, 1945, the assignment of error is overruled and the judgment affirmed.